## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| MARSHA D. OWENS, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )  No. 13-cv-3429 |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social | ) |
| Security, | ) |
| | ) |
| **Defendant.** | ) |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

Plaintiff Marsha D. Owens appeals from the denial of her application for Social Security Disability Benefits (DIB) and Supplemental Security Income Disability Benefits (SSI) (collectively Disability Benefits) under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423, 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Owens has filed a Motion for Summary Judgment (d/e 12), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 18).  For the reasons set forth below, this Court

AFFIRMS the decision of the Commissioner in part and REVERSES and REMANDS in part.

## Statement of Facts

Owens was born on November 22, 1954. She graduated from high school. She has previously worked as a data entry clerk and a general office clerk. R. 145, 275-78. Owens last worked full-time on May 31, 2003. Certified Transcript of Proceedings before the Social Security Administration (d/e 9 and 10) (R.), 85, 275-78. On November 21, 2011, Owens applied for DIB benefits, and four years and five months later, on May 7, 2013, she applied for SSI benefits. Owens initially alleged that she became disabled on December 21, 2003 (Onset Date), and later amended the alleged Onset Date to November 1, 2006. R. 145, 18, 100. The last date on which Owens was insured for DIB benefits was December 31, 2008 (Last Date Insured). Owens suffers from obesity and arthritis/degenerative joint disease in the knees and left shoulder, as well as foot pain and sleep apnea. R. 18-19.

On July 15, 2002, Owens saw Dr. Thomas Wiss, M.D. Owens complained of pain in her right heel. Dr. Wiss diagnosed plantar fasciitis. R. 1003. Dr. Wiss saw Owens several times from July

2002 to May 21, 2004 for continuing problems with her feet.  Dr. Wiss prescribed ice massages, injections, pain medication, and orthotic inserts in Owens' shoes.  R. 1000-03.

On November 20, 2006, Owens saw an orthopedic specialist, Dr. Leo Ludwig, M.D., for pain in both of her knees.  Dr. Ludwig noted that Owens had been taking oral pain medication for her knees and back for two years, including Nabumetone and Darvocet.  Dr. Ludwig noted that Owens had also undergone five Hyalgan injections and cortisone injections in both knees.  Owens reported that none of the treatments had brought any long-term relief.  R. 989.  Owens measured 5 feet, 6 ¾ inches tall and weighed 298 pounds at the time of the examination.  On examination, Owens walked unaided.  Dr. Ludwig observed some swelling in the right knee, and found a small effusion on palpation.  The right knee had crepitation.  X-rays showed bone-on-bone advanced arthritis with severe patellofemoral disease in her right knee.  The x-rays showed moderate changes in the left knee.  Dr. Ludwig advised Owens that she needed knee replacement surgery, but he opined that she was young for such a surgery.  Dr. Ludwig recommended to her that she should live with the condition at this point in time.  R. 989-90.

On January 17, 2007, x-rays were taken of Owens' left shoulder and right foot. Owens was experiencing pain in her shoulder. The x-rays showed mild degeneration in the AC joint in her left shoulder and no acute abnormalities in her right foot. R. 383.

On March 8, 2007, Owens underwent arthroscopic surgery of her left shoulder. Dr. Rodney J. Herrin, M.D., performed the surgery. The surgery revealed that Owens had tendinitis in the rotator cuff and a small tear in the upper border of the subscapularis. Dr. Herrin performed a subacromial decompression and debridement of the tear during the surgery. R. 500. On July 16, 2007, Owens underwent an MRI of her right shoulder. The MRI showed osteoarthritis of the AC joint, a complete tear of the infraspinatus tendon with tendon retraction and muscle atrophy; tendinopathy with partial tear of the supraspinatus tendon; partial tear of the subcapularis tendon with medical dislocation of the long head biceps tendon; atrophy of the teres minor muscle; and effusion. R. 494.

On August 31, 2007, Dr. Herrin performed arthroscopic surgery on Owens' right shoulder to repair a right rotator cuff

muscle.  During that same procedure, Dr. Herrin administered an injection into Owens' left shoulder and into her right knee.  R. 486-87.

On October 30, 2007, Owens saw Dr. George A. Geranios, M.D., for swelling and redness in her feet and ankles.  At this visit, Owens weighed 293 pounds.  Dr. Geranios assessed edema of the foot and prescribed diuretics for five days.  R. 362.

On November 26, 2007, Owens saw Dr. Wiss for a follow-up of her October 2007 appointment with Dr. Geranios.  Owens had completed a five-day course of diuretics.  On examination, Dr. Wiss noted that the redness had resolved, but Owens was still sensitive bilaterally in her lower legs.  R. 362.

On August 5, 2008, Dr. Herrin performed a right total knee replacement surgery on Owens.  R. 474.  On August 21, 2008, Owens saw Dr. Herrin for follow-up on the right knee replacement surgery.  Owens reported that she was improving, but that she was still experiencing pain.  Dr. Herrin assessed some calf tenderness and swelling.  R. 472.

On September 9, 2008, Owens saw Dr. Herrin again for a follow-up appointment.  Owens was doing better.  She had no pain

on motion.  R. 471.  On September 15, 2008, Owens saw Dr. Herrin again.  Dr. Herrin assessed that Owens was improving.  On November 10, 2008, Owens saw Dr. Herrin for a follow-up.  Dr. Herrin found that Owens was doing fairly well, but Dr. Herrin noted that Owens reported "a little bit of discomfort posterior laterally." R. 469.

On December 15, 2008, Owens saw Dr. Geranios.  Owens complained that she had had pain in her right leg since her knee replacement surgery.  Owens measured 5 feet 6 inches tall and weighed 290 pounds at the time of the visit.  Dr. Geranios prescribed pain medication, heat, and rest.  R. 341.

On July 14, 2009, Owens saw Dr. Geranios for a urinary tract infection.  Owens weighed 312 pounds at that time.  Dr. Geranios prescribed antibiotics for the infection.  R. 336.

On August 6, 2009, Owens saw Dr. Herrin for a one-year follow-up examination on her right knee replacement surgery. Owens had no pain in moving the knee, and the knee was stable. Owens still was having "discomfort medially and laterally in the knee."  R. 467.  Dr. Herrin assessed some possible bursitis, but he could not rule out the possibility of adhesions or soft tissue

impingement.  R. 467.  Dr. Herrin administered an injection into the knee to treat the pain.  R. 467.

On October 12, 2009, Owens saw Dr. Herrin for a follow-up on her knee replacement surgery.  Owens reported that her condition had improved, but her knee still "bothers her somewhat."  Owens reported some swelling.  On examination, Dr. Herrin did not see "a great deal of swelling," but he noted some tenderness.  Dr. Herrin recommended conservative treatment and a recheck in four months.  R. 466.

On October 20, 2009, Owens underwent an MRI of her right forefoot.  Dr. Geranios ordered the MRI.  The MRI showed a nondisplaced fracture in the base of the third and fourth metatarsals and osteoarthritis in the fourth tarsometatarsal joint. R. 1004.

On January 11, 2010, Owens saw Dr. Herrin for a follow-up of her knee replacement surgery.  Owens reported still having pain, but she said the injections in August 2009 helped.  Dr. Herrin assessed right knee pain after knee replacement surgery.  He recommended ice and pain medication.  R. 464.

On February 15, 2010, Owens saw Dr. Edward Trudeau, M.D., for a neurological consultation for pain in her right foot. Dr. Philip Siebert, D.P.M. referred Owens to Dr. Trudeau. Dr. Trudeau stated that he had seen Owens twice before, eight and nine years earlier, for pinched nerves. On examination, Dr. Trudeau noted tenderness in the lumbar region and over the right foot on palpation, and mildly hypoactive reflexes in the knees and ankles. Dr. Trudeau conducted nerve conduction and EMG studies. The studies showed mild to moderately severe peroneal and sural neuropathy, as well as mild to moderately severe S-1 lumbar radiculopathy. R. 294-99.

On October 13, 2010, Owens had a MRI of her back. The MRI showed moderate spinal canal stenosis, severe stenosis at L4/5, and mild stenosis at L5/S1. R. 533.

On November 2, 2010, Owens saw a pain specialist, Dr. Ferdinand Savacion, M.D., for leg and back pain. On examination, Owens' gait was within normal limits. Her lumbar spine had full range of flexion and extension but was painful at the end of the range of motion. Owens was able to stand on her heels and toes. Owens could stand on each leg independently. Straight leg testing, however, was positive bilaterally. Dr. Savacion also reviewed the

October 2010 MRI of Owens' spine.  Dr. Savacion diagnosed lumbar degenerative disk disease, lumbar spinal stenosis, and lumbar radiculitus.  He scheduled Owens for lumbar epidural steroid injections.  R. 530-31.  Dr. Savacion administered two injections into Owens' lumbar spine on November 12 and 29, 2010.  R. 526, 528.

On April 11, 2011, Owens saw Dr. Herrin complaining of pain in her left shoulder and her right knee.  Owens reported that the pain in her shoulder extended into her arm.  She reported pain at night.  Owens also reported pain in her right knee that extended into her right calf and thigh.  On examination, Owens had reduced range of motion in her shoulder and some pain.  Owens had pain on palpation in her knee.  Dr. Herrin administered an injection into Owens' shoulder.  Dr. Herrin recommended strengthening exercises for her knee.  R. 461-62.

May 31, 2011, Owens underwent diagnostic arthroscopic surgery of her right knee.  Dr. Herrin performed the procedure.  Dr. Herrin found evidence of extensive synovitis in the joint as well as soft tissue joint impingement related either to scar formation or

adhesions.[1]  Dr. Herrin performed an extensive synovectomy and removal of an impinging soft tissue lesion.  R. 457-58.

On July 14, 2011, Owens saw Dr. Herrin for a follow-up after her right knee arthroscopic surgery.  Owens reported that her knee was doing better.  R. 455.

On November 17, 2011, Owens saw Dr. Geranios.  Owens complained of low back pain and numbness and swelling in her hands.  Owens weighed 324 pounds at the time of this visit.  On examination, Dr. Geranios found tenderness in the lumbosacral spine on palpation.  Dr. Geranios diagnosed lumbar stenosis.  R. 506-08.

On November 21, 2011, Owens filed a claim for DIB benefits.  She alleged that her Onset Date was December 21, 2003.  R. 145, 18, 100.

On November 30, 2011, and December 15, 2011, Owens saw pain specialist Dr. Ferdinand Savacion, M.D.  On both occasions, Dr. Savacion administered injections into Owens' lumbar spine for pain.  R. 506-12.

---

[1] Synovitus is an inflammation of the lubricating membrane that lines a joint.  American Medical Association, Complete Medical Encyclopedia (2003), at 1185.

On January 20, 2012, Owens saw Dr. Trudeau.  Dr. Scott
McClain, M.D., had referred Owens to Dr. Trudeau for a
neurological consultation due to Owens' complaints of pain in her
back, neck, and legs, and numbness and tingling in her hands.  On
examination, Dr. Trudeau found tenderness diffusely in the
cervical, lumbar, and interscapular regions, and also in the
posterior of the right knee and calf.  Dr. Trudeau found normal
strength in the upper extremities but weakness in the ulnar-
innervated intrinsic and APB muscles on either side.  Dr. Trudeau
also found weakness in the great toes, greater right than left.  R.
873.

Dr. Trudeau performed nerve conduction and EMG studies.
The studies showed S1 radiculopathy, mild L5 radiculopathy,
peroneal neuropathy, and mild to moderately severe right sided
carpal tunnel syndrome and mild on the left.  Dr. Trudeau found no
current evidence of sural neuropathy.  R. 874-79.  Dr. Trudeau
stated:

> Before we go any further, we would mention that we did
> happen to notice that there was a request for information with
> Social Security disability, and that seems entirely
> inappropriate.  We, of course, do not have any control over the
> legal system, and what is consider (sic) disability in the

medical system may not be considered in the legal system. Therefore, the 2 systems are sort of parallel but do not always overlap completely.  In other words, sometimes we doctors can feel a patient is very disabled, yet for some reasons they may not meet the criteria federally.  However, considering that this pleasant lady, who we saw 10 years ago and 2 years ago and currently, and she has been here for hours and we always interact with her intensively and we have the utmost respect and regard for her, it seems very, very positive that this is a patient who should qualify for disability.  Again, we cannot be an adjudicator or a judge, etc.; that would be completely up to the legal system, so to speak, but at this point if there is any patient who in our opinion qualifies for disability, it would be this pleasant lady certainly considering what she had dealt with.

R. 872-73.

On February 29, 2012, state agency physician Dr. Richard Bilinsky, M.D., prepared a Physical Residual Functional Capacity Assessment form.  R. 847-53.  Dr. Bilinsky opined on Owens' physical residual functional capacity as of December 31, 2008, her Last Date Insured for DIB benefits.  R. 16, 847.  Dr. Bilinsky opined that as of that date, Owens could lift twenty pounds occasionally and ten pounds frequently; could stand and/or walk for six hours in an eight-hour workday; could sit for six hours in an eight-hour workday; could frequently climb ladders, ropes, and scaffolds; and could frequently stoop, kneel, crouch, and crawl.  R. 847-48.  Dr.

Bilinsky opined that Owens had no other physical limitations on her functional capacity.  R. 848-53.

On April 18, 2012, state agency Dr. Towfig Arjmand, M.D., affirmed Dr. Bilinsky's opinions of Owens' physical residual functional capacity as of December 31, 2008, Owens' Last Date Insured for DIB benefits.  R. 854-56.

On May 8, 2012, Owens saw Dr. McClain.  Dr. McClain prescribed ibuprofen for the pain.  Dr. McClain also noted that Owens was taking hydrocodone for pain.  Dr. McClain stated that Owens' sleep apnea was not optimally controlled.  Owens reported waking up sleepy and hypersomnolence and fatigue during the day. R. 860-62.

On June 4, 2012, Owens saw a sleep specialist, Dr. Jerry Reed, M.D.  Owens reported daytime sleepiness.  Owens was using a CPAP machine with oxygen at night.[2]  Dr. Reed noted that Owens apnea should be well controlled by her CPAP machine.  Dr. Reed prescribed an awake-promoting medication, Nuvigil.  R. 974-76.

---

[2] CPAP is a continuous positive airway pressure machine.  See National Institutes of Health, National Heart, Lung, and Blood Institute, Explore CPAP, available at http://www.nhlbi.nih.gov/health/health-topics/topics/cpap, viewed July 20, 2015.

On June 25, 2012, Owens saw Dr. Reed.  Owens reported that the Nuvigil was not working.  Dr. Reed increased dosage of the Nuvigil and directed Owens to continue using her CPAP.  R. 971-72.

On November 13, 2012, Owens saw Dr. Soo Kim, M.D.  Owens saw Dr. Kim because of an increase of pain and swelling in her ankles and feet.  Owens reported swelling and pain in both legs since she started a new job where she had to sit without much leg exercise.  R. 900.  Dr. Kim noted trace edema in her extremities.  Owens' upper and lower strength extremity was full and symmetrical.  Dr. Kim prescribed a diuretic and compression stockings.  R. 900-03.

On December 28, 2012, Owens underwent an MRI of her left shoulder.  Dr. Herrin ordered the MRI.  The MRI showed profound fatty atrophy of her infraspinatus muscle and a thin remnant of a tendon.  The tests also showed tendinosis and a partial surface tear of the supraspinatus, moderate arthritis in the AC joint with a prominent superior spurring, and osteophyte formation on the humeral head.  R. 916-17.

On January 3, 2013, Owens saw Dr. Herrin for arthritis of the knee and for left shoulder pain.  Dr. Herrin stated that he was not

certain that any surgical intervention in her shoulder would help because of significant atrophy.  Dr. Herrin recommended Mobic as an anti-inflammatory medication.  He also noted the possibility of injections in her left knee, and in the future, a possible left knee replacement surgery.  R. 905-06.

On January 8, 2013, Owens saw Dr. Reed regarding her sleep apnea.  Owens weighed 298 pounds at that time.  Owens complained of fatigue.  Dr. Reed opined that her fatigue could be due to sleep apnea.  Dr. Reed noted that Owens compliance with use of the CPAP was excellent.  Dr. Reed ordered her to continue using the CPAP.  Dr. Reed was not prescribing Nuvigil for Owens at this time.  R. 969-70.

On May 7, 2013, Owens filed her application for SSI benefits. R. 16.

On May 14, 2013, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 66-102.  Owens appeared in person and with her attorney.  Vocational expert Dr. James Lanier, Ph.D., also appeared.[3]  The ALJ presided over the hearing in Peoria,

---

[3] Dr. Lanier's Past Relevant Work Summary states that he holds a Ph.D.  R. 274.

Illinois.  Owens, her attorney, and Dr. Lanier appeared by
videoconference in Springfield, Illinois.  R. 68.

Owens testified first.  She was 58 years old at the time of the
hearing.  She testified that she was 5 feet 6 inches tall and weighed
297 pounds.  She was unmarried with no children.  She lived alone
in a ranch style home with one story and a basement.  R. 71-72.

Owens testified that she currently worked part-time for an
insurance adjuster.  She took pictures of wrecked vehicles and filled
out paperwork.  She testified that she would meet with the insured,
collect information, and take photographs of the vehicle.  She then
uploaded the photographs and typed the other information into her
computer and sent the information to her employer.  She testified
that she also has worked part-time for Kelly Services.  R. 73.  In
2012, Owens made approximately $2,000.00 in her part-time work.
R. 83.

Owens testified that she completed high school.  She had
worked as an administrative assistant for a telephone company.
She typically sat six hours a day at this job.  The heaviest weight
she carried was twenty pounds.  She typically carried objects

weighing five pounds on a regular basis.  She carried objects weighing twenty pounds about once every three weeks.  R. 76.

Owens testified that she took hydrocodone daily for pain.  She testified that she had been taking hydrocodone for ten years.  She took two to three tablets per day if she was staying at home, and four or five if she was leaving the house.  She testified that the hydrocodone made her feel dizzy and lightheaded, "like I'm just off balance."  R. 77.  Owens testified that six to seven days a month she would not take any hydrocodone.  R. 78.

Owens testified that she drove herself about ten to fifteen miles per week.  Owens testified that she could bathe herself, dress herself, and otherwise take care of her own personal hygiene.  She testified that she cooked, washed dishes, and did laundry; and she vacuumed, dusted, and swept her home.  Her brother did any necessary heavy mopping.  She testified that vacuuming was difficult.  She testified that she had to stop several times because of her back.  R. 79.

Owens testified that she shopped for groceries.  She testified that she hung on to the grocery cart for support.  She testified that she went out once or twice a week to visit with friends and family.

R. 79-80.  She testified that friends or family came to her house to visit "perhaps twice a month."  R. 80.  She was a member of the Telephone Pioneers of America, but she did not attend their functions.  She went to one once since she retired.  She did not attend church.  R. 80.

Owens testified that she watched television four to five hours a day.  She spent two hours a day on the computer.  She did not spend time reading.  R. 80.

Owens testified that her occasional work with Kelly Services involved either data entry or mail extraction.  The job involved opening quarterly estimated income tax payments.  Owens testified that the work was very painful, "My back is very painful, and my knees.  While I am here, I take a pain pill before I leave my house, and within two and a half hours typically I take a second hydrocodone."  R. 83.

Owens testified that in 2007 and 2008, she was experiencing shoulder and back pain.  Owens testified that sitting was painful.  She also testified that she could not reach for items on a bookshelf, such as booklets or manuals.  R. 84.

Owens testified that she stopped working on May 31, 2003, because the telephone company closed the office in which she worked and she was terminated.  R. 85.  Owens testified that if the facility had not closed, she could have worked about a year to a year and a half longer.  She testified that she would have been forced to stop working because of the pain.  She testified that she had pain any time she lifted her arms and pain when she carried any objects.  R. 85.

Owens testified that, in 2007 and 2008, she could stand in one position for fifteen minutes.  She testified that she could walk half a block.  R. 87-88.

Owens testified that she was had swelling in her right knee both before and after the knee replacement surgery.  Owens testified that she had to prop her legs up in a recliner and ice her knee and leg to reduce the swelling.  R. 88.  Owens testified that she had a little problem with her left knee in 2007 and 2008, but it has since gotten worse.  R. 88.

Owens testified that her pain affected her concentration.  "It is hard for me to focus on what a person in saying to me.  It's like I cannot absorb what they're telling me."  R. 89.

Owens testified that, in 2007 and 2008, she experienced swelling in her feet and ankles.  She also testified that she was diagnosed with plantar fasciitis.  She testified that her condition made it harder to walk.  She testified that the orthotic inserts in her shoes helped, but she still had problems walking more than a block.  R. 89-90.

Owens testified that her weight affected her other problems. She testified that her weight put added stress on her knees, feet, and back.  She testified that she had tried to lose weight.  She testified that she could not exercise because of the pain in her feet, knees, and back.  R. 90.

Owens testified that she could sit for an hour if she could shift her weight and stand occasionally.  She testified that after an hour she needed to get up and move and, "perhaps take another pain pill."  R. 90-91.  She testified that she could alternate between sitting and standing for about four hours.  R. 91.  She testified that she worked four-hour shifts when she worked for Kelly Services. After her four-hour shift, she needed to lie down and rest for an hour.  R. 91.  She testified that she then would typically put in a load of laundry and do some vaccuming and dusting.  She testified

that she typically performed housework by working thirty minutes and then resting thirty minutes.  R. 91-92.

Owens testified that her brother did yard work for the last two years.  For two to three years before that, her niece and nephew did her yard work.  R. 92.

Dr. Lanier then testified.  The ALJ asked Dr. Lanier,

> I would like you to assume you have an individual of the same age, education, and experience as the claimant.  This individual is limited to light work, limited to frequent postural activities.  How would these restrictions affect the performance of claimant's past relevant work?

R. 95.  Dr. Lanier opined that these restrictions would not affect the individual's ability to perform Owens' past relevant work.  R. 96. Dr. Lanier classified Owens' prior work at the telephone company as a general office clerk.  R. 98.

Dr. Lanier opined that a person would be terminated if she missed four or more days of work per month.  R. 96-97.  Dr. Lanier also opined that a person would be terminated if she took extra breaks that made her "less than 80 percent productive on the job." R. 97.

At the end of the hearing, Owens' attorney confirmed that Owens was amending her alleged Onset Date to November 1, 2006.

Owens' attorney based the amendment on Dr. Herrin's examination

of her shoulder and knee on November 20, 2006.  R. 100-01.  The

ALJ concluded the hearing.

## The Decision of the ALJ

The ALJ issued his decision on May 30, 2013.  R. 16-27.  The

ALJ followed the five-step analysis set forth in Social Security

Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520,

416.920.  Step 1 requires that the claimant not be currently

engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b),

416.920(b).  If true, Step 2 requires the claimant to have a severe

impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3

requires a determination of whether the claimant is so severely

impaired that she is disabled regardless of her age, education and

work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet

this requirement at Step 3, the claimant's condition must meet or

be equal to the criteria of one of the impairments specified in 20

C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§

404.1520(d), 416.920(d).  If the claimant is not so severely

impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ also considered the relevant time frames for determining eligibility for DIB benefits and SSI benefits.  To be eligible for DIB benefits, the claimant must be disabled prior to her Date Last Insured.  The date last insured depends on the claimant's work history.  See 42 U.S.C. § 423(c)(1); 20 C.F.R. 404.131.  Owens'

Date Last Insured was December 31, 2008.  R. 16.  A claimant may be entitled to SSI benefits regardless of work history or dates of insurance; however, she may only be eligible to receive benefits commencing on the date she applied for SSI benefits.  20 C.F.R. § 416.335.  Owens applied for SSI benefits on May 7, 2013.

The ALJ found that Owens met her burden at Step 1.  The ALJ found that Owens had not engaged in substantial gainful activity since November 1, 2006, her amended alleged Onset Date.  The ALJ found that Owens's occasional part-time work for the insurance adjuster and Kelly Services did not rise to the level of substantial gainful activity.  R. 18-19.

At Step 2, the ALJ found that Owens suffered from the severe impairments of arthritis/degenerative joint disease in the knees and left shoulder and obesity.  R. 119.  The ALJ found that Owens' foot pain and sleep apnea were non-severe because they were effectively treated.  The foot pain was treated with orthotic inserts, and the apnea was treated with a CPAP machine.  R. 19-20.  The ALJ found that Owens' back problems were non-severe because the problems were effectively treated by Dr. Savacion with lumbar injections.  R. 20.

At Step 3, the ALJ found that Owens' impairments or combination of impairments did not meet or equal a Listing.  R. 21.

At Step 4, the ALJ found that Owens had the RFC to perform light work except that she could only engage in postural activities frequently.  R. 22.  The ALJ relied on the opinions of Drs. Bilinsky and Arjmand.  The ALJ gave their opinions "significant weight in this matter."  R. 24.

The ALJ rejected Dr. Trudeau's quoted opinion that Owens was disabled.  The ALJ found that Dr. Trudeau was an examining physician, not a treating physician.  The ALJ found that Dr. Trudeau's opinion was not supported by his findings.  Dr. Trudeau found that Owens had normal strength in her extremities, and his nerve conduction/EMG studies showed only mild to moderate neuropathies and radiculopathies.  The ALJ found that these objective findings did not support his opinions.  R. 25-26.

The ALJ found that Owens' testimony about the degree to which she was functionally limited by her pain was not credible. The ALJ found that the knee replacement surgery relieved most, but not all, of her knee pain.  The ALJ found that Owens' activities were not consistent with her testimony.  She worked a part-time job.

She took care of her personal hygiene and most of the housework inside her home.  She visited friends regularly, watched television, and used the computer.  The ALJ found that these activities, along with the objective medical findings, did not support her testimony about the degree of functional limitation caused by her pain.  R. 26.

At Step 4, the ALJ found that Owens could return to her prior work as a general office clerk.  The ALJ relied on the RFC and the opinion of Dr. Lanier.  Based on that evidence, the ALJ found that Owens was not disabled through the date of his opinion.  R. 26-27.

The ALJ considered Owens' obesity through the Analysis.  The ALJ noted that no medical source "specifically attributed additional or cumulative limitations to the claimant' (sic) obesity to the extent that such would cause disability.  The medically determinable evidence supports the residual functional capacity finding of this decision.  This is the case even considering the existence of the claimant's obesity."  R. 23.

### Analysis

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate" to support the decision.

Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must

accept the findings if they are supported by substantial evidence,

and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d

79, 82 (7th Cir. 1986).  This Court will not review the credibility

determinations of the ALJ unless the determinations lack any

explanation or support in the record.  Elder v. Astrue, 529 F.3d

408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least

minimally his analysis of all relevant evidence.  Herron v. Shalala,

19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate

and logical bridge from the evidence to his conclusion."  Clifford v.

Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's finding that Owens was not entitled to DIB benefits

because she was not disabled on her Last Date Insured, December

31, 2008, was supported by substantial evidence.  The opinions of

Drs. Bilinsky and Arjmand supported the finding.  The records from

Dr. Herrin showed that Owens had undergone largely successful

surgeries on her right knee and both shoulders.  By December 31,

2008, she was experiencing some pain in her knee, but there was

no evidence that the function of her knee was affected.  Dr. Lanier's

opinion supported the finding that Owens could perform her prior work as a general office clerk.  The ALJ's finding that, as of her Last Date Insured, Owens could perform her prior relevant work was supported by substantial evidence.  Therefore, the ALJ's determination that Owens was not disabled for purposes of DIB benefits was supported by substantial evidence.

However, the ALJ's finding that Owens was not entitled to SSI benefits because she was not disabled on or after May 7, 2013 was not supported by substantial evidence.  The relevant date for determining whether Owens was disabled for SSI benefits was the date of her application, May 7, 2013.  Drs. Bilinsky and Arjmand rendered opinions on Owens' physical RFC on December 31, 2008, the Last Date Insured for DIB benefits.  R. 847-53 and R. 854-56.  The ALJ relied on the opinions of Drs. Bilinsky and Arjmand to support his RFC finding for both DIB benefits and SSI benefits.  The ALJ gave those opinions significant weight.  R. 25.

The ALJ failed to explain how the opinions of Drs. Bilinsky and Arjmand of Owens' RFC on December 31, 2008 were entitled to significant weight in determining Owens' RFC some four years and five months later on May 7, 2013.  Drs. Bilinsky and Arjmand did

not consider the medical evidence after December 31, 2008,

including: (1) the MRI in 2010 that showed moderate spinal canal

stenosis, severe stenosis at L4/5 and mild stenosis at L5/S1; (2) the

2010 examination by Dr. Savacion that showed positive straight leg

testing bilaterally; (3) the nerve conduction/EMG studies in 2010

and 2012 that showed S1 radiculopathy, mild L5 radiculopathy,

peroneal neuropathy, and mild to moderately severe carpal tunnel

syndrome on the right and mild on the left; (4) the 2012 MRI of her

left shoulder that showed profound fatty atrophy and a thin

remnant of a tendon, as well as a muscle tear, moderate arthritis

with spurring, and osteophyte formation on the humeral head; (5)

Dr. Herrin's opinion that the atrophy was so severe that he could

not provide any relief surgically; and (6) Owens' second surgery on

her right knee in 2011.

Drs. Bilinsky and Arjmand did not consider the evidence

because at the time they rendered their opinions Owens had only

filed for DIB benefits, so the only relevant question was her RFC on

her Last Date Insured.  Owens, however, filed her SSI application

on May 7, 2013, and the ALJ decided her SSI Benefits eligibility in

his decision.  The Court does not understand how the ALJ could

give significant weight to the opinions of Drs. Bilinsky and Arjmand for determining Owens' RFC on May 7, 2013, in light of the fact that Drs. Bilinsky and Arjmand did not consider the significant medical evidence from 2009, 2010, 2011, 2012, and 2013, including the medical evidence mentioned in the preceding paragraph.

The ALJ, therefore, failed to explain adequately the basis for his determination of Owens' RFC as of May 7, 2013, the relevant date for SSI eligibility. As a result, the ALJ's finding at Step 4, that Owens could perform her past relevant work from May 7, 2013, to the date of his decision, was not supported by substantial evidence. The ALJ's conclusion that Owens was not disabled for purposes of SSI benefits is reversed and remanded.

On remand, the ALJ may consider securing some additional medical evidence or opinions to assist him in determining Owens' RFC as of May 7, 2013, and thereafter.

Owens argues that the ALJ erred in rejecting Dr. Trudeau's opinion. The Court disagrees. The ALJ properly concluded that Dr. Trudeau was not a treating physician. Dr. Trudeau was an examining physician, not a treating physician. Treating physicians referred Owens to Dr. Trudeau for neurological testing. Dr.

Trudeau conducted his examination and testing and sent the results to the treating physicians.  R. 294-99 (sending results to Dr. Siebert); R. 871-80 (sending results to Dr. McClain).  The ALJ, therefore, properly determined that Dr. Trudeau's opinion should not be treated as an opinion from a treating physician.  See 20 C.F.R. § 404.1527(c).  The ALJ correctly noted that Dr. Trudeau found only moderate to mild neuropathies and radiculopathies and normal strength in her extremities.  These findings provide substantial evidence to support the ALJ's decision to reject Dr. Trudeau's quoted opinion because the opinion was inconsistent with his own findings.

Owens argues that the RFC finding was not supported by substantial evidence.  The Court disagrees with respect to the findings before Owens' last date insured for DIB benefits, December 31, 2008.  Drs. Bilinsky and Arjmand's opinions support this finding.  In addition, the medical evidence showed that as of December 31, 2008, she had undergone successful surgeries on her shoulders and a largely successful right knee replacement surgery.  She stopped complaining about foot pain and had not yet begun complaining about the treatment of her sleep apnea.  This evidence

constitutes substantial evidence to support the ALJ's RFC finding as of the Date Last Insured.  As discussed above, the ALJ's RFC finding with respect to Owens' condition on May 7, 2013, when she filed for SSI benefits is reversed and remanded.

Owens challenges the ALJ's credibility finding.  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record. Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The medical records in the fall of 2008 show that Owens was improving after her shoulder surgeries and right knee replacement surgeries, particularly in the records from Dr. Herrin at that point in time.  R. 469-74.  In light of those medical records, the Court will not review the ALJ's credibility determination with respect to Owens' claims of functional limitations from her pain before the Date Last Insured of December 31, 2008.  The ALJ will necessarily need to review his credibility determination regarding her condition on May 7, 2013, the relevant date for SSI benefits.  The current credibility determination relied in part on her condition in 2008.  R. 26.

THEREFORE, Plaintiff's Motion for Summary Judgment (d/e 12) and Defendant's Commissioner of Social Security's Motion for

Summary Affirmance (d/e 18) are ALLOWED in part and DENIED

in part.  The decision of the Commissioner is AFFIRMED in part

and REVERSED and REMANDED in part.

ENTER: January 20, 2016

FOR THE COURT:

_____s/Sue E. Myerscough_____
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE
